UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DWIGHT OLIVIER,

                        Plaintiff,                          REPORT AND
                                                                  RECOMMENDATION

    -against-

                                                05 CV 4001 (SJF) (RML)

ADVANCED STERILIZATION PRODUCTS,
INC., ETHICON, INC., and JOHNSON &
JOHNSON COMPANY,

                        Defendants.
--------------------------------------------------------X

LEVY, United States Magistrate Judge:

                Plaintiff Dwight Olivier ("plaintiff") brings this products liability suit against

defendants Advanced Sterilization Products, Inc. ("ASP"), Ethicon, Inc., and Johnson & Johnson

Company (collectively, "defendants"),[1] claiming that exposure to Cidexplus® 28 Day Solution

("Cidexplus"), a cold sterilization agent manufactured by ASP[2] and employing glutaraldehyde as

its active ingredient, caused him to develop interstitial lung disease.  His complaint asserts

claims on the bases of strict liability, misrepresentation, breach of express warranty, breach of

implied warranty, negligence, and fraud.[3]  (Complaint, dated Aug. 22, 2005 ("Compl."), ¶ 25.)

---

[1] ASP is a wholly-owned subsidiary of Ethicon, Inc., which in turn is a wholly-owned subsidiary of Johnson & Johnson Company.  (Douglas K. Chia Affidavit, sworn to Nov. 1, 2007 ("Chia Aff."), ¶ 3.)

[2] Neither Johnson & Johnson Company nor Ethicon, Inc., researches, develops, or manufacturers Cidexplus.  (Chia Aff. ¶ 4; Richard Adam Affirmation, sworn to Nov. 26, 2007, Ex. 3 (Kevin Corrigan Deposition, sworn to May 18, 2007 ("Corrigan Dep."), 9:15-20, 10:2-13:12).)

[3] "Fraud" and "misrepresentation" are legally indistinguishable under New York law, as "the same legal standards apply" to both.  Tuosto v. Philip Morris USA, Inc., No. 05 Civ. 9384,
(continued...)

He also seeks punitive damages. (Compl. ¶ 25.) Defendants now move pursuant to Federal Rule of Civil Procedure 56(c) for summary judgment against plaintiff. By order dated December 12, 2007, the Honorable Sandra J. Feuerstein, United States District Judge, referred this motion to me for a report and recommendation. Briefing was completed on December 7, 2007, and I heard oral argument on February 26, 2008. For the reasons stated below, I respectfully recommend that defendants' motion be granted.

## BACKGROUND

Plaintiff, an ultrasound technologist, began working in the emergency room of St. Luke's Hospital ("St. Luke's") in Newburgh, New York, in June 2000 and transferred to the ultrasound department a year later. (Richard Adam Affirmation, sworn to Nov. 26, 2007 ("Adam Aff."), Ex. 1 (Dwight Olivier Deposition, sworn to Apr. 3, 2007 ("Olivier Dep."), 5:2-18.) It is not clear from the record what duties his position entailed. For example, plaintiff variously claims that he developed diagnostic film in St. Luke's darkroom, while at another point insists that he did not develop film at St. Luke's because the hospital used digital cameras. (Compare Dwight Olivier Affidavit, sworn to Nov. 26, 2007 ("Olivier Aff."), ¶ 31, with Olivier Dep. 48:9-14.) During the summer of 2000, St. Luke's trained plaintiff how properly to use Cidex Activated, a glutaraldehyde[4]-based sterilization product that he used to sterilize ultrasound

[3](...continued)
2007 WL 2398507, at *4 n.4 (S.D.N.Y. Aug. 21, 2007). Compare Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993), with Ferrone v. Brown & Williamson Tobacco Corp., No. 97 CV 5669, 1998 WL 846783, at *4 (E.D.N.Y. Sept. 25, 1998).

[4] "Glutaraldehyde is a colorless, oily, liquid-chemical with a pungent odor. . . . In the health care industry, glutaraldehyde is most often used to disinfect equipment that cannot be heat sterilized . . . . " Nat'l Inst. for Occupational Safety & Health, CDC, NIOSH Health & Safety
(continued...)

probes.  (See Adam Aff. Ex. 3 (Kevin Corrigan Deposition, sworn to May 18, 2007 ("Corrigan Dep."), 30:6-8.)  The training included safety measures, such as the necessity of keeping the product in a closed container and using it only under a ventilated hood.  (Olivier Dep. 26:21-29:4, 30:13-35:3.)  Plaintiff also received and read written material describing how to use Cidex Activated safely.  (Olivier Dep. 28:20-29:6.)  By January 2002, plaintiff encountered the product on a near daily basis as coworkers routinely sterilized medical equipment in his presence.  However, even when plaintiff personally used Cidex Activated to cold sterilize equipment approximately twice a month, he never came into physical contact with the product.  (Olivier Dep. 40:9-24, 41:12-42:17.)

From May to August 2002, plaintiff also worked part-time as an ultrasound technician at Middletown Medical, P.C. ("Middletown Medical"), in Newburgh, New York, where his duties also included developing X-ray film.  (Olivier Dep. 46:11-47:2.)  Instead of Cidex Activated, Middletown Medical used Cidexplus – the product at issue in this matter – to sterilize ultrasound equipment.  Cidexplus also uses glutaraldehyde as its active ingredient.  (Corrigan Dep. 30:25-31:3.)  According to plaintiff, Middletown Medical did not follow the rigorous safety standards, such as ensuring proper ventilation, employed at St. Luke's.  (Olivier

---

[4](...continued)
Topic: Glutaraldehyde (Sept. 2006), http://www.cdc.gov/niosh/topics/glutaraldehyde/.  "Health effects that may occur as a result of exposure to glutaraldehyde include but are not limited to the following:  Throat and lung irritation, Asthma and difficulty breathing, Nose irritation, Sneezing, Wheezing, Burning eyes and conjunctivitis, Contact and/or allergic dermatitis."  Id.  Regulation of products containing the chemical was transferred from the United States Environmental Protection Agency to the United States Food and Drug Administration ("FDA") in the early 1990s.  (Corrigan Dep. 25:10-19.)  In approving its use by healthcare professionals, the FDA classified glutaraldehyde as a "less significant risk device" safe for use.  (Corrigan Dep. 21:6-23:13.)

Dep. 53:2-56:14.)  Although he never personally used Cidexplus at Middletown Medical, plaintiff states that a large, moist-looking carpet stain around a Cidexplus bottle in his work area was present continuously during his tenure at Middletown Medical.  (Olivier Dep. 57:21-23, 60:10-63:21.)  Plaintiff's co-worker told him that the stain resulted from product spills, though plaintiff never personally witnessed a spill occur.  (Oliver Dep. 60:10-20.)

Soon after commencing his second job, plaintiff, a life-long non-smoker and accomplished athlete with no history of respiratory problems, began to experience shortness of breath and poor stamina.  (Olivier Aff. ¶¶ 9-11.)  On July 6, 2002, he was admitted to Nyack Hospital complaining of shortness of breath.  (Olivier Aff. ¶¶ 9-10; John D. Winter Affidavit, sworn to Nov. 1, 2007 ("Winter Aff."), Ex. I.)  He told his treating physician, Dr. Stephen Menitove, that his symptoms began after being exposed to glutaraldehyde and chemical fumes in Middletown Medical's darkroom.  (Winter Aff. Exs. I, J, K, L.)  A chest X-ray and CT scan revealed bilateral alveolar infiltrates[5] and pneumomediastinum,[6] prompting further review of his condition.  (Winter Aff. Ex. K.)  Doctors diagnosed him with hypersensitive pneumonitis[7] of an

---

[5] Fluid in the lungs.  See MedlinePlus: Medical Dictionary, Infiltrate, http://www2.merriam-webster.com/cgi-bin/mwmednlm (last visited May 1, 2008).

[6] The condition of having air present between the lungs in the chest cavity.  See MedlinePlus: Medical Dictionary, pneumomediastinum, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=pneumomediastinum (last visited May 1, 2008).

[7] Inflamation of the lung tissue.  See MedlinePlus: Medical Dictionary, pneumonitis, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=pneumonitis (last visited May 1, 2008).

unknown cause and treated him with prednisone, which failed to alleviate his symptoms. (Winter Aff. Ex. L.)  Notably, at this time plaintiff consulted a rheumatologist because of joint stiffness.  (Winter Aff. Ex. L.)

On September 21, 2002, plaintiff was readmitted to Nyack Hospital after developing a high fever and worsening shortness of breath, which he again attributed to exposure to X-ray chemical developers and a Cidexplus spill at work.  (Winter Aff. Ex. M.)  Soon thereafter, he was transferred to Columbia Presbyterian Hospital ("Columbia Presbyterian") and underwent a lung biopsy.  (Winter Aff. Exs. M, N.)  Based on the biopsy results, Dr. Lyall Gorenstein diagnosed plaintiff with non-specific interstitial pneumonitis and diffuse alveolar damage.  (Winter Aff. Ex. N.)  Blood work revealed positive anti-Jo1 and anti-Ro antibodies as well, which, in conjunction with other findings, were deemed consistent with a diagnosis of anti-synthetase syndrome,[8] a rheumatologic disease.  (Winter Aff. Exs. M, N.)  Laboratory tests conducted in 2005 would verify the continued presence of anti-Jo1 antibodies in plaintiff's blood.  (Winter Aff. Ex. O.)  Plaintiff was discharged from Columbia Presbyterian on October 18, 2002.  (Winter Aff. Ex. M.)

On October 31, 2002, an ASP representative spoke with Dr. Emily A. Dimango, a pulmonologist who treated plaintiff at Columbia Presbyterian, to determine whether plaintiff's condition "may be a FDA reportable issue" as an illness arising from Cidexplus exposure.

---

[8] Anti-synthetase syndrome is a rare, chronic autoimmune disease of unknown etiology. Synthetases are a family of enzymes located in the cell cytoplasm that catalyze the attachment of amino acids to their corresponding transfer RNA for cell wall and structural protein development.  (See Gary R. Epler Affidavit, sworn to Oct. 17, 2007, Ex. B.)

(Winter Aff. Ex. P at 2.)  The doctor reported that she "highly doubted" plaintiff's condition stemmed from such exposure and that "the lab data she has obtained show markers that are consistent with rheumatologic illness."[9]  (Winter Aff. Ex. P at 3.)

Three months later, plaintiff returned to his position as an ultrasound technologist at St. Luke's.  (Olivier Dep. 96:9-15.)  Although he remains employed, he states that his "job description had to be modified.  [He] work[s] under heavy limitations, . . . can't walk for more than 20 feet without rest, . . . [is] not allowed to lift any object weighing more than 10 pounds, and . . . must have access to [his] oxygen bottle at all times."  (Olivier Aff. ¶ 41.)  He also states that his doctors have advised him that he is a candidate for a lung transplant.  (Olivier Aff. ¶ 39.)

Defendants do not deny that Cidexplus can cause mild respiratory irritation, as its labeling clearly warns.  (See Winter Aff. Exs. F (Package Insert for Cidexplus), G (Material Safety Data Sheet for Cidexplus), H (Package Label for Cidexplus).)  However, they maintain that no evidence elucidates any causal connection between Cidexplus or glutaraldehyde and interstitial lung disease.  (See Memorandum of Law in Support of Defendants' Summary Judgment Motion 7 ("Defs. Mem.").)

On June 11, 2003, plaintiff brought a claim before the New York Workers' Compensation Board ("the Board") for damages allegedly caused by his exposure to darkroom chemicals and Cidexplus at Middletown Medical.  (Winter Aff. Ex. Q.)  Nearly four months later, the Board denied his claim.  After a hearing, Judge John Farrell found "[n]o prima facie

---

[9] The court recounts the ASP representative's meeting with Dr. Dimango simply to provide a full background history of the case.  The doctor's conclusions do not qualify as competent, admissible evidence, and the court has not considered them in its determination.  See Fed. R. Civ. P. 26(a)(2)(B).

evidence" to support plaintiff's claim, because the "7/9/2002 report of Dr. Menitove does not specify [a] causal relationship." (Winter Aff. Ex. R.) On August 22, 2005, Plaintiff filed suit in this Court. Defendants now move for summary judgment.

DISCUSSION

**A. Issue Preclusion**

Defendants argue that plaintiff is prohibited from pursuing any claims in this Court because "he previously raised, and lost, a worker's compensation action decided on the same set of facts." (Defs. Mem. 21.) In a two-sentence decision, the Workers Compensation Judge found that there was "[n]o prima facie evidence" to support plaintiff's injury claim, because the evidence "does not specify [a] causal relationship." (Winter Aff. Ex. R.)

Section 11 of the New York Workers' Compensation Law provides that "[t]he liability of an employer [to pay workers' compensation] . . . shall be exclusive and in place of any other liability whatsoever, to such employee." N.Y. Workers' Comp. L. § 11 (McKinney 2000). While the statute "precludes recovery in a civil action against the employer, it does not preclude recovery against unrelated, contributing third parties." Hastings v. Trinity Broad. of N.Y., Inc., 130 F. Supp. 2d 575, 577 (S.D.N.Y. 2001) (quotation marks & internal citation omitted); see also Kern v. Frye Copysystems, Inc., 878 F. Supp. 660, 666 (S.D.N.Y. 1995) ("[I]t is well settled that the policies underlying the Worker's Compensation Law do not preclude an employee from maintaining a common-law action against a third-party tort-feasor who may be responsible, in whole or in part, for his injuries.").

However, collateral estoppel, or issue preclusion, prohibits the relitigation of matters litigated or decided in an earlier action. Zimmermann v. Harris, Inc., No. 94 Civ. 0438,

1997 WL 257478, at *2 (S.D.N.Y. May 15, 1997).  The doctrine applies

> when (1) the issues in both proceedings are identical, (2) the issue
> in the prior proceeding was actually litigated and actually decided,
> (3) there was [a] full and fair opportunity to litigate in the prior
> proceeding, and (4) the issue previously litigated was necessary to
> support a valid and final judgment on the merits.

Epperson v. Entm't Express, Inc., 242 F.3d 100, 108 (2d Cir. 2001) (quotation marks & citation

omitted) (brackets in original).

        In his claim to the Board, plaintiff alleged that he developed pneumonitis – not

interstitial lung disease – at Middletown Medical from exposure to darkroom chemicals and

fumes in the ultrasound department resulting from an uncleaned chemical spill.  (See Winter Aff.

Ex. Q at 2.)  Dr. Menitove's records, which the Board examined, state that plaintiff complained

of "shortness of breath after being exposed in a new job to fumes, a developer chemical in a dark

room situation."  (Winter Aff., Ex. J at 1; accord Winter Aff. Ex. K.)  Nowhere do Dr.

Menitove's records indicate that he considered the possibility that exposure to Cidexplus gave

rise to plaintiff's pneumonitis, let alone interstitial lung disease.  Further, the brevity of the

judge's opinion makes it difficult to discern what issues the Board considered.  The decision

simply states that the evidence did not prove causation, without specifying the alleged agent or

resulting injury at issue.  Due to the vagueness of the Board's decision, I cannot assume that the

issues in that proceeding were "identical" to the issues before this Court.  See Epperson, 242

F.3d at 108.  I therefore recommend that the court find that plaintiff is not collaterally estopped

from bringing these claims.  See United States v. Gregg, 463 F.3d 160, 165 n.1 (2d Cir. 2006)

(quoting D'Arata v. N.Y. Cent. Mut. Fire Ins. Co., 564 N.E.2d 634, 636 (N.Y. 1990)).

**B. Standard for Summary Judgment**

A court shall grant summary judgment "if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and decide only whether there is any genuine issue to be tried. Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988). "[T]he court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact." United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.").

A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, id. at 252; "assertions that are conclusory" will not suffice. Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

**C. Plaintiff's Causes of Action**

Plaintiff seeks recovery for the injuries that he allegedly suffered from Cidexplus exposure based on six causes of action detailed below:

1. Strict Liability:  Plaintiff claims that Cidexplus "was defective in development, design, manufacture, storage, packaging and labeling and as a result was defective, unsafe, and inadequate for the use for which they [sic] were made and intended to be used." (Compl. ¶ 41.)

Furthermore, due to these substandard attributes, as well as "defective . . . distribution, marketing and sale," plaintiff maintains that it was "inherently dangerous and thus unreasonably dangerous" for the product "to be placed into the stream of commerce without adequate packaging and suitable warning to potential purchasers, users and individuals in the same or similar position as Plaintiff." (Compl. ¶ 42.) According to plaintiff, these assertions hold especially true because the product's defective characteristics "lulled the potential purchasers, users and individuals in the same or similar position as Plaintiff into a false sense of security and protection . . . when in fact" the product lacked "adequate warnings and precautions so as to protect plaintiff . . . from serious injuries resulting from exposure." (Compl. ¶ 43.)

2. <u>Misrepresentation</u>: Plaintiff avers that defendants' promotion of Cidexplus as a fast-acting sterilization product that boosted medical efficiency "constituted [a] material misrepresentation[] that deceptively characterized [Cidexplus] as a safe product when . . . . Defendants knew, or should have known, of the extreme danger that existed" from using it. (Compl. ¶¶ 53-54; <u>see</u> Compl. ¶ 50.)

3. <u>Breach of Express Warranty</u>: According to plaintiff's complaint, defendants "warranted for a period of time from the date of purchase that [Cidexplus] was merchantable, fit for its intended purpose, and free from defects in material, storage, packaging and/or workmanship" and that "[a]s a result of the defects in material, packaging, and/or workmanship, . . . Defendants breached their express warranty." (Compl. ¶¶ 58-59.)

4. <u>Breach of Implied Warranty</u>: Plaintiff likewise contends that he relied on defendants' "skill or judgment to select a suitable product for the sterilization, disinfection and cleaning of medical instruments that would not unreasonably pose harm to himself [sic]," but

due to the product's defects, defendants breached implied warranties of merchantability and fitness for a particular purpose. (Compl. ¶ 63; see Compl. ¶¶ 64, 66-67.)

5. <u>Negligence</u>: In addition, plaintiff states that defendants behaved carelessly and negligently in "designing, packaging, testing, developing, manufacturing, storage, distributing, marketing, selling, and placing [Cidexplus] into the stream of commerce" and were likewise "careless and negligent in failing to warn purchasers [and] users . . . of the inherently dangerous characteristics of th[e] product." (Compl. ¶ 71.)

6. <u>Fraud</u>: In his last count, plaintiff insists that "Defendants, through their employees, agents and representatives, provided assurances relative to the development, design, manufacture, storage, packaging, and safety of [Cidexplus], as well as [its] quality and suitability . . . for the applications and circumstances likely to be encountered in medical establishments." (Compl. ¶ 75.) However, defendants and their representatives "knew or should have known that [these representations] were false, material, and designed to induce the purchase . . . in reliance" upon them. (Compl. ¶ 76; see Compl. ¶¶ 77-79, 81.)

Although these claims span diverse areas of tort and contract law, all depend on plaintiff's ability to demonstrate a causal link between Cidexplus exposure and interstitial lung disease. Defendants maintain that plaintiff cannot demonstrate such a link. If true, this inability would prove fatal to each of plaintiff's claims, since "causation is an element not only in . . . strict products liability claims, but in . . . negligence, breach of warranty, fraud, misrepresentation and per se negligence claims as well." <u>Sita v. Danek Med., Inc.</u>, 43 F. Supp. 2d 245, 252 (E.D.N.Y. 1999); <u>accord</u> <u>Viscusi v. Proctor & Gamble</u>, No. 05 CV 01528, 2007 WL 2071546, at *10-13 (E.D.N.Y. July 16, 2007) (same); <u>Donald v. Shinn Fu Co.</u>, No. 99 CV 6397,

2002 WL 32068351, at *6 (E.D.N.Y. Sept. 4, 2002) ("As with all alleged torts, if the act or omission – here the defective product – was not the proximate cause of plaintiff's injury, the defendant incurs no liability."); Fritz v. White Consol. Indus., Inc., 762 N.Y.S.2d 711, 714 (4th Dep't 2004) (same); Tardella v. RJR Nabisco, Inc., 576 N.Y.S.2d 965, 966 (3d Dep't 1991) (same); see Watson v. LIRR Co., 500 F. Supp. 2d 266, 271 (S.D.N.Y. 2007) (noting that product must cause harm to give rise to negligence); Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055, 1062 (N.Y. 2001) (same); Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006) (noting that under New York law, fraud requires showing of damage to plaintiff resulting from purportedly fraudulent act); Tuosto v. Philip Morris USA, Inc., No. 05 Civ. 9384, 2007 WL 2398507, at *4, 8 (S.D.N.Y. Aug. 21, 2007) (same); Denny v. Ford Motor Co., 662 N.E.2d 730, 735, 736 (N.Y. 1995) (implying that under strict products liability theory and implied warranty actions, product must cause injury in question); CBS Inc. v. Ziff-Davis Publ'g Co., 553 N.E.2d 997, 1001 (N.Y. 1990) (noting that breach of warranty must occur for express warranty claim to arise); Robinson v. Reed-Prentice Div. of Package Mach. Co., 403 N.E.2d 440, 443 (N.Y. 1980) (stating that product must cause harm to give rise to strict products liability claim); Belling v. Haugh's Pools, Ltd., 511 N.Y.S.2d 732, 733 (4th Dep't 1987) (same).

In a products liability action, "a plaintiff must prove both general and specific causation as part of his or her *prima facie* case." In re Rezulin Prods. Liab. Litig., 441 F. Supp. 2d 567, 575 (S.D.N.Y. 2006); see Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 268 (2d Cir. 2002). "General causation bears on whether *the type of injury at issue can be caused or exacerbated* by the defendant's product, while specific causation addresses whether, in the particular instance, the injury *actually was caused or exacerbated* by the defendant's product."

Rezulin Prods. Liab. Litig., 441 F. Supp. 2d at 575 (footnote & quotation marks omitted).

Further, plaintiff must show general causation as a predicate for establishing specific causation.

See id. ("[I]f there is no evidence that a product is capable of causing the kind of harm claimed,

then there is no basis to accept evidence that the product in fact did so in a specific case.").

      In cases such as this, when "the subject-matter to be inquired about [– the causal

relationship between glutaraldehyde and interstitial lung disease –] is presumed not to be within

common knowledge and experience" of the court, "[o]rdinarily, expert medical opinion

evidence, based on suitable hypotheses, is required." Fane v. Zimmer, Inc., 927 F.2d 124, 131

(2d Cir. 1991); accord Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004) ("[W]here

an injury has multiple potential etiologies, expert testimony is necessary to establish

causation."); Amorgianos, 303 F.3d at 268 (same); Watson, 500 F. Supp. 2d at 271 ("Expert

testimony usually is necessary to establish a causal connection between an injury and its source

unless the connection is a kind that would be obvious to laymen . . . . " (quoting Tufariello v.

LIRR Co., 458 F.3d 80, 89 (2d Cir. 2006) (quotation marks omitted)); Rezulin Prods. Liab.

Litig., 441 F. Supp. 2d at 575-76 (same).

**D. Plaintiff's Evidence**

      Plaintiff presents no expert testimony or report to substantiate his causation

theories. Rather, he relies upon medical records from Dr. Kevin Chan, purportedly an

occupational health specialist at Mt. Sinai Medical Center,[10] who first examined plaintiff on

August 7, 2003, after plaintiff lost his workers' compensation claim. (Adam Aff. Ex. 10; see

Olivier Aff. ¶ 28.) These records primarily consist of two one-page distillations of plaintiff's

---

    [10] As detailed below, plaintiff has not presented a curriculum vitae for Dr. Chan.

examination. The first section of each synopsis details the doctor's preliminary observations; the

second lists his assessment of plaintiff's condition; and the third establishes plaintiff's treatment

plan. (See Oral Argument Transcript, Feb. 26, 2008, 8.)

Although courts have admitted expert testimony from medical doctors based on

patient examinations, Dr. Chan's records prove deficient on multiple grounds. See Figueroa v.

Boston Scientific Corp., 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003). First, the records do not

conform to the requirements for admission of expert testimony set out in the Federal Rules of

Civil Procedure. The disclosure of the testimony

> *must* be accompanied by a written report – prepared and signed by
> the witness – if the witness is one retained or specially employed
> to provide expert testimony in the case . . . . The report *must*
> contain:
> (i) a complete statement of all opinions the witness will express
> and the basis and reasons for them;
> (ii) the data or other information considered by the witness in
> forming them;
> . . .
> (iv) the witness's qualifications, including a list of all publications
> authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous four years,
> the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and
> testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Dr. Chan's records contain none of these, and so

the court cannot verify the qualifications, motivations, or even raw data underlying Dr. Chan's

statements. See also Viscusi, 2007 WL 2071546, at *6 ("[T]o determine whether the testimony

of a party's proffered expert should be deemed admissible . . . . the court must investigate"

whether the expert is "qualified as an expert by knowledge, skill, experience, training or

education." (quotation marks & internal citations omitted)). Furthermore, the records do not contain "sufficient facts or data," and do not self-evidently stem from "reliable [scientific] principles and methods," as required from expert testimony. Id. at *5.

"The trial court's task 'is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Figueroa, 254 F. Supp. 2d at 365 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)); accord Watson, 500 F. Supp. 2d at 271, 272 ("As a general matter, . . . unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment." (quoting Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005)) (quotation marks omitted) (ellipses in original)); see Fed. R. Evid. 104(a), 702; Rezulin Prods. Liab. Litig., 441 F. Supp. 2d at 576; Sita, 43 F. Supp. 2d at 255. Apart from a description of the patient and a few notes on the patient's condition, the records offer only conclusory diagnoses of the patient's probable illnesses and their possible causes. Because of the records' myriad shortcomings, I find them inadmissible as expert testimony. See Viscusi, 2007 WL 2071546, at *5 ("[T]he trial judge must perform a 'gatekeeping' function to ensure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.' It is, therefore, proper for district courts to screen out inadmissible expert testimony on summary judgment." (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993) (internal citation omitted)).

Assuming *arguendo* that Dr. Chan's records constitute admissible expert evidence, they still do not attest to the facts for which plaintiff proffers them. During the August 7, 2003 examination, Dr. Chan noted in his observations that plaintiff "presents with probable

mild airway hyperreactivity secondary to work-related glutaraldehyde exposure and antisynthetase syndrome. . . . Patient's main concern is whether his exposure to gluraraldehyde [sic] could contribute to the development of his antisynthetase syndrome." (Adam Aff. Ex. 10 at 1.) Dr. Chan's diagnosis mirrors this initial evaluation and states that plaintiff has "1. Probable work-related airway hyperreactivity disease (improving) [and] 2. Antisynthetase syndrome (interstitial lung disease with myositis)." (Adam Aff. Ex. 10 at 1.) Dr. Chan draws no connection between interstitial lung disease and glutaraldehyde. The records from the April 29, 2004 follow-up examination similarly state that plaintiff "presents with probable mild airway hyperreactivity secondary to work-related glutaraldehyde exposure. . . . Patient's main concern again is whether his exposure to gluraraldehyde [sic] could contribute to the development of his interstitial lung disease." (Adam Aff. Ex. 10 at 2.) His diagnosis for this session cites: "1. Probable work-related airway hyperreactivity disease (resolving) 2. Antisynthetase syndrome – ruled out 3. H/O interstitial lung disease." (Adam Aff. Ex. 10 at 2.) Dr. Chan does not suggest a link between plaintiff's interstitial lung disease and Cidexplus exposure. Consequently, Dr. Chan's records cannot demonstrate the causation that is a prerequisite for all of plaintiff's claims. See Parker v. Mobil Oil Corp., 857 N.E.2d 1114, 1120-21 (N.Y. 2006) ("It is well-established that an opinion on causation should set forth a plaintiff's exposure to a toxin, that the toxin is capable of causing the particular illness (general causation) and that plaintiff was exposed to sufficient levels of the toxin to cause the illness (specific causation).").

Plaintiff's causation claim suffers other fatal weaknesses. The only evidence he presents to demonstrate that he suffered glutaraldehyde exposure at Middletown Medical stems from anecdotes about a carpet stain near a Cidexplus container at work. (Olivier Aff. ¶ 14.) A

co-worker named "Danielle" told him that the stain was "spillage from the Cidexplus bottle which frequently tipped over especially when ultrasound probes were inserted into it." (Olivier Aff. ¶ 14; <u>see</u> Olivier Dep. 62:15-64:6.) Similarly, after leaving his job at Middletown Medical, a woman known only as "Sharon" told plaintiff that she believed his illness was due to the stain and that she "had also gotten ill, with similar symptoms" to plaintiff's. (Olivier Aff. ¶ 25; <u>see</u> Olivier Dep. 64:14-20, 66:13-18.) Although the stain was "always wet looking" (Olivier Dep. 62:8), plaintiff never saw any spill occur, nor did he ever perceive any smell from the stain, despite glutaraldehyde's characteristically strong odor. <u>See</u> Nat'l Inst. for Occupational Safety & Health, CDC, <u>NIOSH Health & Safety Topic: Glutaraldehyde</u> (Sept. 2006), http://www.cdc.gov/niosh/topics/glutaraldehyde/. His belief as to the origin of the carpet stain derives solely from his recollection of statements made by two co-workers whose surnames plaintiff cannot recall. (Olivier Dep. 60:16-20, 62:9-10, 67:24-68:10.) These statements by unknown individuals constitute inadmissible hearsay and do not competently evidence that Cidexplus was the source of the stain, let alone that fumes from the stain led to plaintiff's lung disease. <u>See</u> Fed. R. Evid. 801(c), 802; <u>Patterson</u>, 375 F.3d at 219 ("The Rule's [Fed. R. Civ. P. 65] requirement that affidavits be made on personal knowledge is not satisfied by assertions made on information and belief." (quotation marks omitted)); <u>see also</u> <u>Mulhall v. Hannafin</u>, 841 N.Y.S.2d 282, 286 (1st Dep't 2007). Despite plaintiff's arguments to the contrary, these anecdotes do not demonstrate that Cidexplus caused his illness.

As a final attempt to prove causation, plaintiff cites prior litigation and other documents in which other individuals allegedly claimed injury from glutaraldehyde exposure. In his brief, plaintiff mentions eight such cases, all without citations. (<u>See</u> Plaintiff's Memorandum

of Law in Opposition to Defendants' Motion for Summary Judgment 8.) Although I could not locate most of these cases, the ones available are inapposite. See, e.g., Avner v. Olympus Optical Co., No. SC055814, 2002 WL 34234182 (Cal. App. Dep't Super Ct. Mar. 18, 2002) (discussing how contaminated colonoscope infected plaintiff with human papillomavirus); Housley v. Wave Energy Sys., Inc., 779 A.2d 453 (N.J. Super. Ct. App. Div. 2001) (finding that plaintiff nurses preempted from bringing products liability suit based on unspecified respiratory problems allegedly caused by glutaraldehyde-based products). Likewise, plaintiff highlights that Kevin Corrigan, ASP's Director of Regulatory Affairs, admitted that ASP received approximately twenty to thirty complaints of "minor" respiratory problems related to glutaraldehyde-based Cidex products since 1998. (See Corrigan Dep. 88:20-21.) None of these complaints deal with interstitial lung disease, and they therefore cannot prove that Cidexplus led plaintiff to develop interstitial lung disease.

### B. Defendants' Evidence

Defendants put forth their own expert testimony to demonstrate the absence of a causal link between Cidexplus and interstitial lung disease. Specifically, they submit the affidavit and expert report of Dr. Gary R. Epler, a board certified pulmonary and critical care specialist at the Brigham and Women's Hospital in Boston, Massachusetts, and Clinical Associate Professor at Harvard Medical School. (See Epler Affidavit, sworn to Oct. 17, 2007 ("Epler Aff."), ¶ 1.) Dr. Epler reviewed plaintiff's medical records from Nyack Hospital, St. Luke's, Columbia Presbyterian, and Dr. Menitove, along with plaintiff's deposition, and concluded that plaintiff suffers from "Anti-Jo 1 synthetase myositis syndrome with nonspecific interstitial pneumonia." (Epler Aff. Ex. B at 1.) According to Dr. Epler, exposure to

glutaraldehyde did not cause, contribute to, or induce plaintiff's condition; rather, "[t]he anti-Jo1 synthetase myositis syndrome is the cause of the nonspecific interstitial pneumonia." (Epler Aff. Ex. B at 6.) Moreover, he reviewed numerous peer-reviewed studies and reports, and concluded that "[t]here have been no case reports or epidemiological studies indicating glutaraldehyde can cause, contribute or induce the development of the anti-Jo 1 synthetase myositis syndrome." (Epler Aff. Ex. B at 8.) He also states that "[t]here have been no case reports or epidemiological studies indicating the [sic] glutaraldehyde can cause or contribute to the development of interstitial lung disease, and no reports indicated glutaraldehyde can cause or contribute to the development of nonspecific interstitial pneumonia." (Epler Aff. Ex. B at 8.) In conclusion, he finds that "exposure to glutaraldehyde from the carpet did not cause, contribute [to] or induce the anti-Jo1 syndrome or the nonspecific interstitial pneumonia." (Epler Aff. Ex. B. at 8.)

Defendants also submit the affidavit and expert report of Dr. Doreen J. Addrizzo-Harris, who is board certified in internal medicine, pulmonary medicine, and critical care; is the pulmonary section chief at the Tisch Hospital of New York University Medical Center; and is the program director of the pulmonary/critical care medicine fellowship training program at the New York University School of Medicine. (Doreen J. Addrizzo-Harris Affidavit, sworn to Oct. 18, 2007 ("Addrizzo-Harris Aff."), ¶ 1.) Dr. Addrizzo-Harris reviewed plaintiff's medical records from Dr. Menitove, Nyack Hospital, and Columbia Presbyterian, along with plaintiff's deposition, and concluded that his history, clinical presentation, and test results are "consistent with a nonspecific interstitial pneumonitis related to an underlying collagen vascular disease most likely a rheumatoid myositis." (Addrizzo-Harris Aff. Ex. B at 2.) She further states:

> I do not believe that there is any evidence of a relationship to his
> occupational history, specifically a relationship to

-19-

Glutaraldehyde/Cidex exposure.  In addition I have performed a review of the published literature and there is no data to support a relationship for glutaraldehyde/Cidex with interstitial or parenchymal[11] lung disease as seen in this case.

(Addrizzo-Harris Aff. Ex. B at 2.)  I find that defendants' experts present thorough, well-informed, and persuasive determinations that Cidexplus does not cause interstitial lung disease and certainly did not lead plaintiff to develop that illness.

<h3 align="center">CONCLUSION</h3>

The medical industry has used glutaraldehyde as a disinfecting agent for over forty years, yet plaintiff can produce no expert testimony, case reports, or epidemiological studies indicating that glutaraldehyde can cause or contribute to the development of interstitial lung disease.  As previously noted, all of plaintiff's claims – be they in strict products liability, negligence, breach of express or implied warranty, fraud, misrepresentation, or negligence – depend on plaintiff's ability to demonstrate that Cidexplus caused his illness.  See, e.g., Sita, 43 F. Supp. 2d at 252; Viscusi, 2007 WL 2071546, at *10-13; Donald, 2002 WL 32068351, at *6; Fritz, 762 N.Y.S.2d at 714; Tardella, 576 N.Y.S.2d at 966; Belling, 511 N.Y.S.2d at 733. Plaintiff fails to demonstrate this nexus.

Under these circumstances, and given the weight of defendants' evidence to the contrary, I find that plaintiff cannot establish a triable issue of material fact on the issue of causation.  See Watson, 500 F. Supp. 2d at 271-72.  Therefore, I respectfully recommend that

---

[11]  The parenchyma are the functional parts of an organ in the body, as opposed to the stroma, which are the supporting tissues of organs.  See MedlinePlus: Medical Dictionary, parenchyma, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=parenchyma (last visited May 1, 2008).

defendants' motion for summary judgment be granted with respect to all of plaintiff's claims and this case be dismissed with prejudice. Objections to this report and recommendation must be filed within ten (10) business days, with courtesy copies to Judge Feuerstein and the undersigned, in order to preserve appellate review. See 28 U.S.C. § 636(b)(1).

Dated: Brooklyn, New York
      June 11, 2008

                                              /s/
                                    ROBERT M. LEVY
                                    United States Magistrate Judge